**ELIZABETH M. BARROS**
California Bar No. 227629
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467 ext. 3701

Attorneys for Mr. Soberanes-Robles

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>v.<br><br>JOSE SOBERANES-ROBLES,<br><br>              Defendant. | U.S.D.C. No. 08CR0254-WQH<br><br>Date:     March 17, 2008<br>Time:    2:00 p.m.<br><br>NOTICE OF MOTIONS AND MOTIONS TO:<br><br>(1)   PRESERVE EVIDENCE AND COMPEL DISCOVERY;<br>(2)   DISMISS INDICTMENT DUE TO MISINSTRUCTION OF GRAND JURY; AND<br>(3)   GRANT LEAVE TO FILE FURTHER MOTIONS |

TO:      KAREN P. HEWITT, UNITED STATES ATTORNEY, AND
            ALESSANDRA SERANO, ASSISTANT UNITED STATES ATTORNEY:

       PLEASE TAKE NOTICE that on March 17, 2008 at 2:00 p.m., or as soon thereafter as counsel

may be heard, Defendant Jose Soberanes-Robles, by and through his attorneys, Elizabeth M. Barros and

Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the following motions.

//

//

//

//

//

1

## MOTIONS

2          Defendant Jose Soberanes-Robles, by and through his attorneys, Elizabeth M. Barros and

3   Federal Defenders of San Diego, Inc., moves this Court pursuant to the United States Constitution, the Federal

4   Rules of Criminal Procedure, and all other applicable statutes, case law, and local rules for an order to:

5          (1)    Preserve Evidence and Compel Discovery;

6          (2)    Dismiss Indictment Due to Misinstruction of the Grand Jury; and

7          (3)    Grant Leave to File Further Motions.

8          This motion is based upon the instant motions and notice of motions, the attached statement

9   of facts and memorandum of points and authorities, the files and records in the above-captioned matter, and

10  any and all other materials that may come to this Court's attention prior to or during the hearing of these

11  motions.

12

13                                          Respectfully submitted,

14

15  Dated: March 3, 2008                         /s/ Elizabeth M. Barros
                                            **ELIZABETH M. BARROS**
16                                          Federal Defenders of San Diego, Inc.
                                            Attorneys for Mr. Soberanes-Robles

17

18

19

20

21

22

23

24

25

26

27

28

**ELIZABETH M. BARROS**
California Bar No. 227629
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467 ext. 3701

Attorneys for Mr. Soberanes-Robles

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE WILLIAM Q. HAYES)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | U.S.D.C. No. 08CR0254-WQH |
| Plaintiff, | Date:   March 17, 2008<br>Time:  2:00 p.m. |
| v. | **STATEMENT OF FACTS AND** |
| JOSE SOBERANES-ROBLES, | **MEMORANDUM OF POINTS AND**<br>**AUTHORITIES IN SUPPORT OF MOTIONS** |
| Defendant. | |

## I.

### STATEMENT OF FACTS[1]

On or about January 19, 2008, Jose Soberanes-Robles (hereinafter "Mr. Soberanes") was arrested after agents discovered approximately 18 kilograms of cocaine in a vehicle he was driving.  Mr. Soberanes was not the registered owner of the vehicle.  Mr. Soberanes made a post-arrest statement denying knowledge of the drugs found in the vehicle.  Nonetheless, on or about January 30, 2008, Mr. Soberanes was indicted by the January 2007 Grand Jury.  The indictment alleges that he imported 18 kilograms of cocaine in violation of 21 U.S.C. §§ 952, 960, and that he possessed 18 kilograms of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1).

---

[1] This statement of facts is based on the complaint and indictment provided by the government.  Mr. Soberanes-Robles does not accept this statement as his own, and reserves the right to take a contrary position at motions and trial.

To date, Mr. Soberanes has received 67 pages of discovery. Although Mr. Soberanes also received a DVD recording of his post-arrest statements, the DVD was not readable. Mr. Soberanes has communicated with the Assistant United States Attorney assigned to the case and is awaiting another copy of the DVD.

**II.**

**MOTION TO COMPEL DISCOVERY AND PRESERVE EVIDENCE**

Mr. Soberanes moves for the production by the government of the following discovery and for the preservation of evidence. This request is not limited to those items about which the prosecutor knows, but includes all discovery listed below that is in the custody, control, care, or knowledge of any government agency. See generally Kyles v. Whitley, 514 U.S. 419 (1995); United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989). To date, the defendant has received only 50 pages of discovery.

1. The Defendant's Statements. The Government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; and any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A) and (B). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

2. Arrest Reports, Notes and Dispatch Tapes. The defense also specifically requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances surrounding his arrest or any questioning, if such reports have not already been produced in their entirety, be turned over to him. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and (B) and Brady v. Maryland, 373 U.S. 83 (1963). See also Loux v. United States, 389 F.2d 911 (9th Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant are available under Fed. R. Crim. P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2 and 12(I). Preservation of rough notes is

1  requested, whether or not the government deems them discoverable.

2      3.  <u>Brady Material</u>.  The defendant requests all documents, statements, agents' reports, and tangible

3  evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the

4  government's case.  Impeachment and exculpatory evidence both fall within <u>Brady's</u> definition of evidence

5  favorable to the accused. <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97

6  (1976).

7      4.  <u>Any Information That May Result in a Lower Sentence</u>.  As discussed above, any information

8  which may result in a more favorable sentence must also be disclosed pursuant to <u>Brady v. Maryland</u>, 373

9  U.S. 83 (1963).  The Government must disclose any cooperation or attempted cooperation by the defendant,

10  as well as any information that could affect any base offense level or specific offense characteristic under

11  Chapter Two of the Guidelines.  Also included in this request is any information relevant to a Chapter Three

12  adjustment, a determination of the defendant's criminal history, or any other application of the Guidelines.

13      5.  <u>The Defendant's Prior Record</u>.  Evidence of a prior record is available under Fed. R. Crim. P.

14  16(a)(1)(D).  Counsel specifically requests a complete copy of any criminal record.

15      6.  <u>Any Proposed 404(b) Evidence</u>.  Evidence of prior similar acts is discoverable under Fed. R.

16  Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon request

17  of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature

18  . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial.  Sufficient

19  notice requires the government to "articulate <u>precisely</u> the evidential hypothesis by which a fact of

20  consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830

21  (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480,

22  1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).

23      This includes any "TECS" records (records of prior border crossings) that the Government intends

24  to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there is nothing

25  intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other

26  acts" evidence that the government must produce before trial.  <u>United States v. Vega</u>, 188 F.3d 1150, 1154-

27  1155 (9th Cir. 1999).

28  //

1      The defendant requests that such notice be given three weeks before trial to give the defense time
2 to adequately investigate and prepare for trial.

3      7. <u>Evidence Seized</u>. Evidence seized as a result of any search, either warrantless or with a warrant,
4 is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

5      8. <u>Request for Preservation of Evidence</u>.  The defense specifically requests that all dispatch tapes
6 or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody,
7 or care of the government and which relate to the arrest or the events leading to the arrest in this case be
8 preserved.  This request includes, but is not limited to, any samples of narcotics used to run any scientific
9 tests, all narcotics, the results of any fingerprint analysis, the vehicle involved in the case, the defendant's
10 personal effects, and any evidence seized from the defendant or any third party.  This request also includes
11 any material or percipient witnesses who might be deported or otherwise likely to become unavailable (e.g.
12 undocumented aliens and transients).

13      It is requested that the prosecutor be ordered to <u>question</u> all the agencies and individuals involved
14 in the prosecution and investigation of this case to determine if such evidence exists, and if it does exist, to
15 inform those parties to preserve any such evidence.

16      9. <u>Henthorn Material</u>. The defendant requests that the Assistant United States Attorney ("AUSA")
17 assigned to this case oversee (not personally conduct) a review of all personnel files of each agent involved
18 in the present case for impeachment material.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 437, 438 (1995) (holding that
19 "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the
20 government's behalf in the case, including the police"); <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir.
21 1991).  This request includes, but is not limited to, any complaints filed (by a member of the public, by
22 another agent, or any other person) against the agent, whether or not the investigating authority has taken any
23 action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary
24 action was ultimately recommended.  The defendant further requests production of any such information at
25 least one week prior to the motion hearing and two weeks prior to trial.  If the prosecutor is uncertain whether
26 certain information should be disclosed pursuant to this request, this information should be produced to the
27 Court in advance of the motion hearing and the trial for an <u>in camera</u> inspection.
28 //

10.  <u>Tangible Objects</u>.  The defendant requests the opportunity to inspect, copy, and test, as necessary, all other documents and tangible objects, including photographs, books, papers, documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).  Specifically, the defendant requests copies of all photographs in the government's possession of the alleged narcotics and the vehicle in which the narcotics were found.

11.  <u>Expert Witnesses</u>.  The defendant requests the name, qualifications, and a written summary of the testimony of any person that the government intends to call as an expert witness during its case in chief.  Fed. R. Crim. P. 16(a)(1)(G).  This summary should include a description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s).  <u>See</u> <u>United States v. Duvall</u>, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did not adequately summarize or describe police detective's testimony in drug prosecution where notice provided only a list of the general subject matters to be covered and failed to identify what opinion the expert would offer on those subjects).  This request includes, but is not limited to, disclosure of the qualifications of any government witness who will testify that he understands and/or speaks Spanish or any other foreign language that may have been used during the course of an interview with the defendant or any other witness.

The defense requests the notice of expert testimony be provided at a minimum of three weeks prior to trial so that the defense can properly prepare to address and respond to this testimony, including obtaining its own expert and/or investigating the opinions, credentials of the government's expert and obtain a hearing in advance of trial to determine the admissibility of qualifications of any expert.  <u>See</u> <u>Kumho v.  Carmichael Tire Co.</u>, 526 U.S. 137, 119 S.Ct. 1167, 1176 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert testimony and such determinations may require "special briefing or other proceedings").

12.  <u>Impeachment evidence</u>.  The defendant requests any evidence that any prospective government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant.  <u>See</u> Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable under <u>Brady v. Maryland</u>.  <u>See</u> <u>United States v. Strifler</u>, 851 F.2d 1197 (9th Cir. 1988) (witness'
//

prior record); <u>Thomas v. United States</u>, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

13. <u>Evidence of Criminal Investigation of Any Government Witness</u>. The defense requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct. <u>United States v. Chitty</u>, 760 F.2d 425 (2d Cir. 1985).

14. <u>Evidence of Bias or Motive to Lie</u>. The defense requests any evidence that any prospective government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or her testimony. <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987); <u>United States v. Strifler</u>, 851 F.2d 1197 (9th Cir. 1988).

15. <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity</u>. The defendant requests any evidence, including any medical or psychiatric report or evaluation, tending to show that any prospective witness's ability to perceive, remember, communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic. <u>United States v. Strifler</u>, 851 F.2d 1197 (9th Cir. 1988); <u>Chavis v. North Carolina</u>, 637 F.2d 213, 224 (4th Cir. 1980).

16. <u>Witness Addresses</u>. The defense requests the name and last known address of each prospective government witness. <u>See</u> <u>United States v. Napue</u>, 834 F.2d 1311 (7th Cir. 1987); <u>United States v. Tucker</u>, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses by counsel is ineffective); <u>United States v. Cook</u>, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has equal right to talk to witnesses). The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a government witness. <u>United States v. Cadet</u>, 727 F.2d 1453 (9th Cir. 1984).

17. <u>Name of Witnesses Favorable to the Defendant</u>. The defendant requests the name of any witness who made any arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged. <u>Jackson v. Wainwright</u>, 390 F.2d 288 (5th Cir. 1968); <u>Chavis v. North Carolina</u>, 637 F.2d 213, 223 (4th Cir. 1980); <u>Jones v. Jago</u>, 575 F.2d 1164,1168 (6th Cir.1978); <u>Hudson v. Blackburn</u>, 601 F.2d 785 (5th Cir. 1979), <u>cert. denied</u>, 444 U.S. 1086 (1980).

//

18. <u>Statements Relevant to the Defense</u>.  The defendant requests disclosure of any statement that may be "relevant to any possible defense or contention" that he might assert.  <u>United States v. Bailleaux</u>, 685 F.2d 1105 (9th Cir. 1982).  This includes Grand Jury transcripts which are relevant to the defense motion to dismiss the indictment.

19. <u>Jencks Act Material</u>.  The defendant requests production in advance of the motion hearing or trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.   A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1).  <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963); <u>see also</u> <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) (holding that interview notes constitutes Jencks material when an agent reviews notes with the subject of the interview); <u>see also</u> <u>United States v. Riley</u>, 189 F.3d 802, 806-808 (9th Cir. 1999).  Advance production will avoid the possibility of delay of the motion hearing or trial to allow the defendant to investigate the Jencks material. Defendant requests pre-trial disclosure of such statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and use properly any Jencks statements during cross-examination.

20. <u>Giglio Information</u>.  Pursuant to <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, expressed or implied, made to any government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any government witnesses.

21. <u>Agreements Between the Government and Witnesses</u>.  The defendant requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective government witness and the government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any immigration benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made or the advice not followed.

//

//

22.  <u>Informants and Cooperating Witnesses</u>.  The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against the defendant.  The government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense.  <u>Roviaro v. United States</u>, 353 U.S. 52, 61-62 (1957).  The government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

23.  <u>Bias by Informants or Cooperating Witnesses</u>.  The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

24.  <u>Personnel Records of Government Officers Involved in the Arrest</u>.  Defendant requests all citizen complaints and other related internal affairs documents involving any of the immigration officers or other law enforcement officers who were involved in the investigation, arrest and interrogation of Defendant.  <u>See Pitchess v. Superior Court</u>, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these documents, defense counsel will be unable to procure them from any other source.

25.  <u>Training of Relevant Law Enforcement Officers</u>.  Defendant requests copies of all written, videotaped or otherwise recorded policies or training instructions or manuals issued by all law enforcement agencies involved in the case (United States Customs Service, Border Patrol, INS, Department of Homeland Security, etc.) to their employees regarding:  (a) the handling of vehicles suspected to be transporting contraband across the port of entry; (b) the referral to secondary inspection of persons within those vehicles; (c) the detention of individuals within those vehicles; (d) the search of those vehicles and the occupants of those vehicles, including the proper means of obtaining consent to search and what constitutes consent to search; (e) the informing of suspects of their Constitutional rights; (f) the questioning of suspects and witnesses.  Defendant also requests all written or otherwise attainable information regarding the training of Customs agents at ports of entry in California to detect or discover narcotics in vehicles entering the United States, including any training offered to Border Patrol, INS, or officers of Homeland Security Department, by the DEA or other law enforcement agencies or individuals.

26. <u>Performance Goals and Policy Awards</u>. Defendant requests disclosure of information regarding standards used for measuring, compensating or reprimanding the conduct of all law enforcement officers involved in the case (Customs, Border Patrol, INS, etc.) to the extent such information relates to the detection of contraband. This request specifically includes information concerning performance goals, policy awards, and the standards used by Customs for commending, demoting, or promoting agents for their performance at the port of entry and their success or failure to detect illegal narcotics in general.

27. <u>Opportunity to Weigh, View and Photograph the Contraband</u>. Defendant hereby requests an opportunity to view, photograph, and weigh the contraband allegedly confiscated in this case.

28. <u>DEA 7 Form</u>. Defendant requests a copy of the DEA 7 form which should indicate the alleged weight and purity of the contraband in this case.

29. <u>TECS Reports</u>. Defendant requests all TECS reports, including reports pertaining to all vehicle border crossings pertaining to the vehicle used in this case and any vehicles pertaining to Defendant, as well as an explanation of TECS provided.

30. <u>Reports of Scientific Tests or Examinations</u>. Pursuant to Fed. R. Crim. P. 16(a)(1)(F), the defendant requests the reports of all tests and examinations conducted upon the evidence in this case. Including, but not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

31. <u>Narcotics Detector Dog Information</u>. Defendant moves for production of all discoverable information about any Narcotics Detector Dogs (NDDs) used in this case, including information regarding: (a) the qualifications of the NDDs and their handlers, (b) the training and experience of the NDDs and their handlers, (c) the government's procedures regarding the treatment, training and rewarding of the NDDs, (d) a detailed description of the exact method the NDDs in this case used to indicate an "alert" to contraband, and (e) the location of the NDD and the vehicle when the NDD alerted, and (f) the NDD's reliability.

32. <u>Residual Request</u>. The defense intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. This request specifically includes all subsections of Rule 16. The defendant

1  requests that the government provide him and his attorney with the above requested material sufficiently in

2  advance of trial.

3  **III.**

4  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS
5  A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH
   _NAVARRO-VARGAS_ AND _WILLIAMS_ AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING
6  MR. SOBERANES OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

7  **A.      Introduction.**

8          The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

9  instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See

10  Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as

11  Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in

12  the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

13  several ways.[2]  These instructions compounded Judge Burns's erroneous instructions and comments to

14  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

15  at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached

16  hereto as Exhibit B.[3]

17        **1.      Judge Burns Instructed Grand Jurors That Their Singular Duty Is to
18             Determine Whether or Not Probable Cause Exists and That They Have
              No Right to Decline to Indict When the Probable Cause Standard Is
19             Satisfied.**

20          After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

21

22

23  _____

24          [2]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States
   v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005)
25  (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-
   Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

26          [3]  The transcript of the voir dire indicates that grand jurors were shown a video
27  presentation on the role of the grand jury.  Mr. requests that the video presentation be produced.
   See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before
28  the grand jury are secret, but the ground rules by which the grand jury conducts those
   proceedings are not.").

responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

Examination of the voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals Judge Burns's emphasis on the singular duty to determine whether or not probable cause exists, and his statement that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed?  And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward.  If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

---

[4]  See also id. at 20 ("You're all about probable cause.").

term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a

1  small amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand

2  juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

3  them to vote "no bill" in the face of a showing probable cause.

4          Just in case there may have been a grand juror that did not understand his or her inability to exercise

5  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

6  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

7  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

8  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

9  considerations into account.

10          Well, those things -- the consequences of your determination shouldn't concern
           you in the sense that penalties or punishment, things like that -- we tell trial
11         jurors, of course, that they cannot consider the punishment or the consequence
           that Congress has set for these things.  We'd ask you to also abide by that.  We
12         want you to make a business-like decision of whether there was a probable
           cause. . . .
13

14  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

15  on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at 25.

16          In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

17  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

18  juror is obligated to vote to indict if there is probable cause.

19          I can tell you sometimes I don't agree with some of the legal decisions that are
           indicated that I have to make.  But my alternative is to vote for someone
20         different, vote for someone that supports the policies I support and get the law
           changed.  It's not for me to say, "well, I don't like it.  So I'm not going to
21         follow it here."

22         You'd have a similar obligation as a grand juror even though you might have
           to grit your teeth on some cases.  Philosophically, if you were a member of
23         congress, you'd vote against, for example, criminalizing marijuana.  I don't
           know if that's it, but you'd vote against criminalizing some drugs.
24         That's not what your prerogative is here.  You're prerogative instead is to act
           like a judge and say, "all right.  This is what I've to deal with objectively.
25         Does it seem to me that a crime was committed?  Yes.  Does it seem to me that
           this person's involved?  It does." *And then your obligation, if you find those*
26         *to be true, would be to vote in favor of the case going forward.*

27  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if both

28  questions are answered in the affirmative, lead to an "obligation" to indict.

1    Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that
2    paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation
3    to indict in every case in which there was probable cause.

4        The Court: Do you think you'd be inclined to let people go in drug cases even
         though you were convinced there was probable cause they committed a drug
5        offense?
         REA: It would depend on the case.
6        The Court: Is there a chance that you would do that?
         REA: Yes.
7        The Court: I appreciate your answers. I'll excuse you at this time.

8    Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his
9    political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it
10   should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to
11   indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns
12   made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to
13   hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict
14   because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[5]
15   See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great
16   a risk to run.

17       **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer
              Exculpatory Evidence.**
18

19       In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the
20   grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex.
21   A at 20.[6]

22   _____

23       [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a
     magistrate judge will have determined the existence of probable cause "in most circumstances"
24   before it has been presented with any evidence. See Ex. A at 6. This instruction created an
     imprimatur of finding probable cause in each case because had a magistrate judge not so found,
25   the case likely would not have been presented to the Grand Jury for indictment at all. The Grand
     Jury was informed that it merely was redundant to the magistrate court "in most circumstances."
26   See id. This instruction made the grand jury more inclined to indict irrespective of the evidence
     presented.
27

28       [6] These instructions were provided in the midst of several comments that praised the
     United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

//

---

that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1 **B.      Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers
2             of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole
             During Impanelment.**

3       The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

4 grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth

5 Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

6 approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

7 the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand

8 jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and instructions given to the January

9 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

10 bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

11 exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

12 States v. Williams, 504 U.S. 36, 49 (1992).

13       For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

14 II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

15 deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

16 as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

17 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

18 I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

19 prosecutorial.").  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

20 the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

21 also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

22 prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of

23 the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

24 "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

25 that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure

26 _____

27       [7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
     majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28 imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand
     jury's constitutional independence.").

1  § 15.2(g) (2d ed. 1999)).

2      Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth

3  in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See id.</u>

4          The grand jury thus determines not only whether probable cause exists, but
           also whether to "charge a greater offense or a lesser offense; numerous counts
5          or a single count; and perhaps most significant of all, a capital offense or a
           non-capital offense -- all on the basis of the same facts. And, significantly, the
6          grand jury may refuse to return an indictment even "'where a conviction can
           be obtained.'"
7

8  <u>Id.</u> (quoting <u>Vasquez</u>, 474 U.S. at 263).  The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of

9  the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury "controls

10 not only the initial decision to indict, but also significant questions such as how many counts to charge and

11 whether to charge a greater or lesser offense, including the important decision whether to charge a capital

12 crime."  <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263).  Judge Hawkins notes that the <u>Navarro-Vargas II</u>

13 majority accepts the major premise of <u>Vasquez</u>: "the majority agrees that a grand jury has the power to refuse

14 to indict someone even when the prosecutor has established probable cause that this individual has committed

15 a crime."  <u>See id.</u> at 1214 (Hawkins, J. dissenting).  <u>Accord</u> <u>Navarro-Vargas I</u>, 367 F.3d at 899 (Kozinski, J.,

16 dissenting; <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

17 dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

18 But not in Judge Burns's instructions.

19 **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established**
        **in Both *Vasquez* and *Navarro-Vargas II*.**
20

21      The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

22 jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

23 in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every

24 finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at

25 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

26 pointed out.  <u>See Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use

27 of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand

28 jurors, and thus to circumscribe the grand jury's constitutional independence.").  <u>See also id.</u> ("The 'word'

1  should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide

2  1579 (1999) (brackets in original)).

3       The debate about what the word "should" means is irrelevant here; the instructions here make no

4  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

5  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

6  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

7  indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9.  Thus, the instruction flatly

8  bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror

9  would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez,

10  474 U.S. at 264.

11       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

12  an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only

13  mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

14  only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

15  probable cause, "then the grand jury should hesitate and not indict." See id. at 8.  At least in context, it would

16  strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

17  jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was

18  not.

19       The full passage cited above effectively eliminates any possibility that Judge Burns intended the

20  Navarro-Vargas spin on the word "should."

21          [T]he grand jury is determining really two factors: "do we have a reasonable
            belief that a crime was committed?  And second, do we have a reasonable
22          belief that the person that they propose that we indict committed the crime?"

23          If the answer is "yes" to both of those, then the case should move forward.  If
            the answer to either of the questions is "no," then the grand jury should not
24          hesitate and not indict.

25  See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially states that

26  if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

27  room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

28  1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two different meanings of the word "should" in the space of two consecutive sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have had that understanding.[8]  Jurors are not presumed to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

(1)    The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

---

[8]  This argument does not turn on Mr. 's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

(2)     In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime was committed?  Yes.  Does it seem to me that this person's involved?  It does."  *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(3)     As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."

1  See id. at 61.

2      (4)    And then again, after swearing in all the grand jurors who had already agreed to indict in every

3  case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded

4  them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the

5  evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law

6  ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

7      Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

8  penalties to which indicted persons may be subject.

9          Prospective Juror (REA): ... And as far as being fair, it kind of depends on
            what the case is about because there is a disparity between state and federal
10          law.
            The Court:  In what regard?
11          Prospective Juror: Specifically, medical marijuana.
            The Court:  Well, those things -- the consequences of your determination
12          shouldn't concern you in the sense that penalties or punishment, things like that
            -- *we tell trial jurors, of course, that they cannot consider the punishment or*
13          *the consequence that Congress has set for these things. We'd ask you to also*
            *abide by that.*  We want you to make a business-like decision of whether there
14          was a probable cause. ...

15  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

16  would obviously leave no role for the consideration of penalty information.

17      The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

18  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

19  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

20  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

21  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

22  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

23  consideration of penalty information.  See 474 U.S. at 263.

24      Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

25  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

26  was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

27  contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

28  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

1  Vasquez:

2          The grand jury does not determine only that probable cause exists to believe
       that a defendant committed a crime, or that it does not. In the hands of the
3          grand jury lies the power to charge a greater offense or a lesser offense;
       numerous counts or a single count; and perhaps most significant of all, a
4          capital offense or a non-capital offense – all on the basis of the same facts.
       Moreover, "[t]he grand jury is not bound to indict in every case where a
5          conviction can be obtained."

6  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

7  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

8  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

9  charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor

10  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

11  id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent

12  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

13  jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

14  therefore be dismissed. Id.

15          The Navarro-Vargas II majority's faith in the structure of the grand jury is not a cure for the

16  instructions' excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

17  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

18  decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

19  have on a grand jury because "it is the structure of the grand jury process and its function that make it

20  independent." Id. at 1202 (emphases in the original).

21          Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

22  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

23  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The

24  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

25  making a probable cause determination ... unconstitutionally undermines the very structural protections that

26  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

27  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

28  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

1  in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

2  instructions because nothing will happen if they disobey them."  Id.

3          In setting forth Judge Hawkins' views, Mr.  understands that this Court may not adopt them solely

4  because the reasoning that supports them is so much more persuasive than the majority's sophistry.  Rather,

5  she sets them forth to urge the Court *not to extend* what is already untenable reasoning.

6          Here, again, the question is not an obscure interpretation of the word "should", especially in light

7  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

8  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the

9  right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

10  Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

11          Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states

12  they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

13  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See Ex.

14  A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden

15  grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience

16  of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

17  exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government

18  by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &

19  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

20  initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

21  Burns has both fashioned his own rules and enforced them.

22  **D.      The Instructions Conflict with Williams' Holding That There Is No Duty to Present
23         Exculpatory Evidence to the Grand Jury.**

24          In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

25  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

26  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

27  common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory'

28  judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority

1  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

2  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

3  Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it

4  does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." Id.

5  at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

6  initiative, rules of grand jury procedure." Id. at 50.  As a consequence, Williams rejected the defendant's

7  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

8         Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

9  present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

10         Now, again, this emphasizes the difference between the function of the grand
       jury and the trial jury.  You're all about probable cause.  If you think that

11       there's evidence out there that might cause you say "well, I don't think probable
       cause exists," then it's incumbent upon you to hear that evidence as well.  As

12       I told you, in most instances, *the U.S. Attorneys are duty-bound to present*
       *evidence that cuts against what they may be asking you to do if they're aware*

13       *of that evidence*.

14  Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

15  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

16  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See

17  id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See

18  Navarro-Vargas, 408 F.3d at 1207.

19         This particular instruction has a devastating effect on the grand jury's protective powers, particularly

20  if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

21  conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20.  Thus, once again,

22  the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

23  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

24  would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

25  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

26  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

27  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

28  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

you to do if they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

    (1)   I have to consider evidence that undercuts probable cause.

    (2)   The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

    (3)   Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.[9]

---

[9] Judge Moskowitz has recently ruled on a motion similar to that filed by Mr. Soberanes. See United States v. Martinez-Covarrubias, Case No. 07CR0491-BTM, Order Denying Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (attached hereto as Exhibit C). While Mr. Soberanes disagrees with Judge Moskowitz's analysis, Judge Moskowitz at least recognizes that a portion of the instruction is error, although he incorrectly found that it was not structural. Ex. C at 11. Because, under Judge Moskowitz's analysis, this Court should determine whether the error was harmless, Mr. Soberanes asks that this Court order the government to produce the transcripts of the grand jury proceedings that resulted in the instant indictment. The Court may order disclosure of grand jury proceedings "at the request of a

1

**IV.**

2

**MOTION FOR LEAVE TO FILE FURTHER MOTIONS**

3    Counsel for Mr. Soberanes has received 67 pages of discovery.  Therefore, Mr. Soberanes requests

4 leave to file further motions as may be necessary upon review of discovery.

5

**V.**

6

**CONCLUSION**

7    For the foregoing reasons, Mr. Soberanes respectfully requests that the Court grant the above motion.

8                                          Respectfully submitted,

9

                                            _/s/ Elizabeth M. Barros_____
10 Dated: March 3, 2008                   **ELIZABETH M. BARROS**
                                            Federal Defenders of San Diego, Inc.
11                                          Attorneys for Mr. Soberanes-Robles

12

13

14

15

16

17

18

19

20

21

22

23    defendant who shows that a ground may exist to dismiss the indictment because of a matter that
24    occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).  The Ninth Circuit requires a
      "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th
25    Cir. 1986), but that need cannot be any different than the standard set for in Rule 6(e)(3)(E)(ii):
      Mr. Soberanes need only show that "a ground *may* exist to dismiss the indictment because of a
26    matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).
      That is why the Rule's "general suggestion [is] in favor of disclosure."  See Walczak, 785 F.2d at
27    857.  Here, under Judge Moskowitz's approach to Judge Burns' erroneous instruction, it is clear
      that, at the very least, "a ground may exist to dismiss the indictment because of a matter that
28    occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).